UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

DIXON SANTIAGO,                              :

                        Plaintiff,           :

       - against -                           :        12 Civ. 7052 (GBD) (FM)

CAROLYN COLVIN, Acting Commissioner          :        **REPORT AND**
of the Social Security Administration,                **RECOMMENDATION**
                                             :        **TO THE HONORABLE**
                        Defendant.                    **GEORGE B. DANIELS**
--------------------------------------------------------x

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____                │
│ DATE FILED: 2/25/14    ____          │
└─────────────────────────────────────┘
```

**FRANK MAAS**, United States Magistrate Judge.

        Plaintiff Dixon Santiago ("Santiago") brings this action pursuant to Section

405(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking review of a final

decision of the Commissioner of the Social Security Administration ("Commissioner")[1]

denying his application for Supplemental Security Income benefits ("SSI").  The parties

have filed cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure.  For the reasons set forth below, the Commissioner's

motion, (ECF No. 16), should be granted and Santiago's motion, (ECF No. 10), should be

denied.

---

        [1]        The complaint in this action named Michael J. Astrue as the defendant.  (ECF No.
1).  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, I have corrected the caption
to reflect the name of the current acting Commissioner.

I.      Procedural Background

On August 28, 2009, Santiago filed an application for SSI benefits,

claiming disability as of August 15, 2009.  (Tr. 96-99).[2]  In his application, Santiago

alleged that he was disabled because he suffered from bipolar disorder, mood swings, and

depression.  (Id. at 156).  The Commissioner initially denied Santiago's application on

December 14, 2009.  (Id. at 60-65).  After obtaining counsel, Santiago requested a de

novo hearing before an administrative law judge ("ALJ").  (Id.).  On April 8, 2011, that

hearing was held before ALJ Katherine Edgell ("ALJ Edgell").  (Id. at 32).  Thereafter,

on May 24, 2011, the ALJ issued a written decision concluding that Santiago was not

disabled within the meaning of the Act.  (Id. at 20-26).  The ALJ's decision became final

on August 16, 2012, when the Appeals Council denied Santiago's request for review.  (Id.

at 1-6).

Santiago then commenced this action on September 18, 2012.  (ECF No. 2).

On March 11, 2013, Santiago filed a motion for judgment on the pleadings.  (ECF No.

10).  On July 3, 2013, the Commissioner cross-moved for judgment on the pleadings.

(ECF No. 16).  Santiago and the Commissioner filed reply papers on July 16 and August

6, 2013, respectively.  (See ECF Nos. 18 ("Pl.'s Reply"), 19 ("Comm'r's Reply")).  Both

motions consequently are fully submitted.

---

[2]      Citations to "Tr." refer to the certified copy of the administrative record filed with
the answer.  (ECF No. 8).

The issue presented by the motions is whether the ALJ's determination that Santiago was not disabled within the meaning of the Act on or after August 25, 2009, is legally correct and supported by substantial evidence.

II.   Factual Background

A.   Non-Medical Evidence

Santiago was born on December 30, 1967, making him forty-one years old at the time of his application for disability benefits. (Tr. 113). He completed school through the ninth grade, and has since spent much of his life in and out of prison for convictions on various drug-related offenses and attempted robberies. (Id. at 40, 378). While in prison, Santiago took the GED exam twice. He failed both times, but once came within one point of passing. (Id. at 40, 226). He most recently was released on parole in September 2007, after a two and one-half month period of incarceration for driving without a license. (Id. at 42, 125).

Since his release, Santiago had been unable to hold a job for more than a few months at a time. Most recently, Santiago worked at a drywall business for three months in 2009. His job duties included cleaning and sweeping. Santiago was fired from that job after he had a physical altercation with a coworker. (Id. at 40-41).

At the time of his application, Santiago lived in a mobile home with his girlfriend, and spent most days watching television, cleaning, and sitting around the home. Although he generally was able to care for his personal needs, he claimed that he

3

often suffered from bouts of depression that made it difficult for him to take care of his personal hygiene and to engage in certain daily living activities.  (Id. at 128, 174, 176). Santiago did not cook or prepare his own food and often resorted to microwaveable meals and fast food.  (Id. at 175).  He was able to manage his personal finances, but only with help from a friend or family member.  (Id. at 131).

In his application, Santiago reported that he did not go outside very often because he was "too sad[,] worried[, or] scared;" when he did occasionally leave the home, it generally was only to walk to the grocery store and back.  (Id. at 132, 176). Because he did not own a driver's license, Santiago primarily traveled by foot.  (Id. at 176).  Although he did not socialize with friends on a regular basis, he spoke with his mother over the phone at least once a week, and frequently had visited with his mother and sister until they moved out of his neighborhood.  (Id. at 48, 132).  His hobbies include exercising, swimming, and playing handball.  (Id. at 385).  He also enjoys fishing, and used to fish year-round before the onset of his depression.  Once he began to experience symptoms of depression, however, Santiago stopped fishing year-round, and now only fishes during the summer time.  (Id. at 131).

At the hearing before ALJ Edgell, Santiago testified to the effects that his depression had on his life.  He reported that he generally was too depressed to take care of himself and often lacked the energy necessary to take on daily tasks.  He had difficulty focusing his thoughts and indicated that he had, at one recent point, contemplated suicide.

(Id. at 44).  Although he testified at the hearing that he spent most of his time "sleep[ing] [his] days away," (id. at 47), he indicated in his application that he was able to sleep only about four hours every night, (id. at 129).  He further reported that he had difficulty following spoken or written instructions, and had trouble getting along with authority figures.  (Id. at 133, 179).  He testified that he could not focus on an entire television show, but said in his application that he spent his waking hours "[w]atch[ing] T.V." and "clean[ing]."  (Id. at 50, 128).

To help manage his symptoms, Santiago regularly took two different types of anti-depressant medication, Seroquel and Lexapro, and a pain reliever, Neurontin. According to Santiago, these medications helped "a little."  (Id. at 43-44).  He also occasionally had attended therapy sessions, although he stopped about two months before the hearing because his Medicaid coverage ended.  (Id. at 45).  Santiago testified that he never had been hospitalized for his psychological issues.  (Id. at 49).

Notwithstanding his psychological symptoms, Santiago reported that he was in good physical health.  He did testify, however, that he smoked cigarettes and suffered from asthma.  (Id.).

B.    Medical Evidence

1.    Treating Sources

a.    Occupations Inc.

Santiago had received intermittent treatment for his bipolar disorder since he was a teenager.  In or around July 2006, following a four and one-half year period of incarceration for possessing and selling a controlled substance, Santiago reported to Occupations Inc. ("Occupations"), a mental health center in Middletown, New York. Doctors there diagnosed Santiago with bipolar disorder and began treatment.  Within less than one year of his initial visit to Occupations, Santiago had returned prison, been released, violated his parole, and returned to prison once again.  His frequent incarceration made it difficult for doctors to render steady treatment for his disorder.  (See id. at 223).

The earliest diagnostic records from Occupations date back to July 31, 2006, when Santiago was seen by one of the center's social workers, Marilyn Morales. Morales assessed the impact of Santiago's mood disorder using the Global Assessment of Functioning ("GAF") scale.[3]  Morales recorded a GAF of 51, indicating "moderate"

---

[3]      The GAF scale was a numeric scale ranging from 0 to 100 that clinicians could use to rate a patient's social, occupational, and psychological functioning.  See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev. 2000) ("DSM-IV-TR").  The scale was introduced in the revised version of the DSM's third edition, id. at 12 (3d ed., rev. 1987), but was removed from the most recent edition, which was released in 2013, id. at 16 (5th ed. 2013) ("DSM-5").

functional limitations.[4]  (Id. at 234).  Morales noted that Santiago had an animated affect and an erratic mood, but that his judgment and sensory abilities were intact.  (Id. at 235).  She further noted that he suffered from mood swings and depression, but currently did not have any suicidal thoughts.  Notwithstanding his reported depression, Morales observed that Santiago had "enough energy" and tried to "stay[] busy."  (Id. at 236).  Following her evaluation, Morales diagnosed Santiago with bipolar disorder and recommended further mental health monitoring to help increase his overall functioning.  (Id. at 233, 237).

Morales again evaluated Santiago on January 9, 2007.  During this visit, Morales recorded a GAF of 50,[5] and indicated that 60 was the highest GAF for Santiago over the past year.  (Id. at 228).  Despite those scores, Morales noted that Santiago displayed an appropriate affect, was in a generally positive mood, and maintained coherent thought processes and memory.  (Id.).  Morales again diagnosed Santiago with bipolar disorder and recommended weekly psychiatric evaluation and psychotherapy, as well as drug treatment.  (Id. at 225-26).

On June 5, 2007, Occupations discharged Santiago after he violated his parole and returned to prison.  In the discharge records, Morales noted that although

---

[4]   Specifically, a GAF in the 51 to 60 range reflects the presence of "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34.

[5]   A GAF in the 41 to 50 range represents a "serious" functional limitation according to the DSM-IV-TR.  DSM-IV-TR at 34.  Nonetheless, Morales indicated that Santiago had a "moderate" impairment in global functioning.  (Tr. 230).

Santiago initially had appeared motivated to improve his psychological condition, his frequent drug use recently had caused him to lose focus on his treatment.  (Id. at 223).

Santiago returned to Occupations on October 30, 2007, after he again was released from prison.  (Id. at 268).  Deborah Strock, one of the center's mental health counselors, performed a psychiatric evaluation.  She noted that Santiago was cooperative and calm, displayed an appropriate affect, had a generally positive mood, and maintained coherent memory and thought processes.  (Id. at 271-72).  She further observed, however, that Santiago showed moderately impaired judgment, minimally impaired insight, and severely impaired global functioning.  (Id. at 271-73).  Despite Santiago's "severe" impairments, Strock recorded a GAF of 55, which was the highest score Santiago had attained in the past year.  (Id. at 268).

On November 5, December 3, and December 31, 2007, and January 29, 2008, Dr. Mohammed Malik, M.D., evaluated Santiago at Occupations.  During each of these visits, Dr. Malik noted that Santiago was cooperative and that his thought processes were intact.   Santiago's mood, however, fluctuated between "depressed" and "normal," depending on the day.  (Id. at 310-28).

Santiago returned to Occupations on February 20, 2008.  Strock recorded a GAF of 50, but noted that Santiago's highest GAF in the past year was 70.  (Id. at 394).  During this visit, Santiago reported that he had found a full-time job and had maintained

it for some time.  (Id.).  He further reported that his mood had stabilized somewhat over the past few weeks.  (Id. at 395).

On March 7, 2008, Occupations again discharged Santiago because he had stopped attending his scheduled psychiatric evaluations and psychotherapy sessions, and had not responded to messages left on his voicemail or to a letter sent to his home.  (Id. at 302).  According to the discharge papers, Occupations had no further plans to follow up with Santiago regarding his treatment.  (Id.).

More than one and one-half years later, after filing his application for disability benefits but before the Commissioner's decision became final, Santiago voluntarily returned to Occupations as an outpatient so that he could obtain medication. During his initial return visit on December 14, 2009, Santiago claimed to suffer from insomnia, anger, depression, auditory and visual hallucinations, persecutory delusions, and suicidal thoughts.  (Id. at 407, 410).  Strock noted that Santiago had an anxious and depressed mood and demonstrated difficulty remaining still.  (Id. at 410).  His speech, thought processes, and memory appeared intact, however, and he had no impairment in his self-perception.  (Id.).  Strock recorded a GAF of 50, noting severe global dysfunction.  (Id. at 407, 411-12).  Following this evaluation, Strock recommended that Santiago continue to receive treatment from Occupations for at least the next three to six weeks.

The records from Occupations indicate that Santiago was evaluated at least two additional times following his return, once on January 12, and once on January 26, 2010.  (Id. at 400-14).  The therapist at those visits recorded observations similar to those made by Strock in December 2009.  (Id.).

        b.     <u>Middletown Mental Health Clinic</u>

After several weeks of treatment, Occupations referred Santiago to the Middletown Mental Health Clinic ("Middletown") because he had expressed interest in receiving more individualized treatment.  Santiago reported to Middletown on April 21, 2010, where he was seen by Dr. Ayse Ozpak.  Dr. Ozpak noted that Santiago was generally cooperative and showed fair judgment and insight.  He did not observe any psychomotor agitation, and indicated that Santiago denied experiencing any hallucinations or delusions.  (Id. at 378-79).  Dr. Ozpak did note, however, that Santiago suffered from depression and anxiety, and that his thought processes were disorganized.  (Id. at 380).  Dr. Ozpak recorded a GAF score of 55, indicating moderate impairment.  (Id.).  Dr. Ozpak noted that Santiago otherwise was in good physical health except that he suffered from asthma.  (Id. at 379, 381).  He diagnosed Santiago on Axis I with Bipolar Disorder, Most Recent Episode Depressed, Severe with Psychotic Features (DSM 296.54) and Cocaine Abuse (DSM 305.60).  On Axis II, he diagnosed Santiago with Antisocial Personality Disorder (DSM 301.7).[6]  Following his evaluation, Dr. Ozpak recommended

---

[6]     "Axis I" and "Axis II" refer to categories in the DSM's multiaxial system of

(continued...)

that Santiago be admitted to the outpatient clinic, and that he follow up for drug treatment and other supportive therapy.  (Id. at 381-82).

Santiago continued to report for services at Middletown over the next few months.  On September 28, 2010, Dr. Ozpak evaluated Santiago and noted that he experienced no side effects from his medication and generally was compliant with his treatment.  Dr. Ozpak further recorded that Santiago's mood was neutral and that he was cooperative and showed fair judgment.  During that visit, Santiago reported that he was experiencing some financial difficulty and asked for assistance in obtaining housing and SSI benefits.  The administrators at the clinic offered to help with Santiago's application, and made a follow-up appointment for October 26, 2010.  (Id. at 387).  The therapist at the October session made similar observations to those recorded at Santiago's September visit.  (Id. at 389).

On February 28, 2011, Middletown discharged Santiago from his service plan because he had failed to attend a number of clinic sessions and had not responded when the clinic attempted to reach out to him.  (Id. at 390-91).

---

[6](...continued)
assessment.  This system was introduced in the third edition of the DSM in 1980, and was designed to help clinicians plan treatment and predict outcomes.  See DSM-IV-TR at 27.  It was dropped in favor of a nonaxial system in the DSM-5.  DSM-5 at 16.  Under the now-outdated multiaxial system, Axis II included personality disorders and mental retardation, and Axis I included all other psychological disorders and conditions that may be a focus of clinical attention.  DSM-IV-TR at 28-29.

c.      <u>Prison Health Records</u>

Santiago underwent medical and psychiatric evaluation on a number of occasions during his various stays in prison.  Records from Orange County Jail during the period from September 2006 to June 2007 note that Santiago suffered from bipolar disorder and had been prescribed antidepressants prior to entering the correctional facility.  Despite his clinical diagnosis, these records indicate that during each of his evaluations, Santiago was alert and oriented, displayed appropriate affect, mood, speech and activity levels, and did not experience hallucinations or delusions.  (<u>Id.</u> at 243, 246, 249, 251).  Records from Bare Hill Correctional Facility, where Santiago was incarcerated in September 2007, similarly indicate that Santiago was taking antidepressants for his bipolar disorder but would be able to live alone upon his release.  (<u>Id.</u> at 262, 265).

Santiago's prison health records also occasionally note that he suffers from asthma, which physicians characterized as "mild [and] intermittent."  According to these records, Santiago was prescribed inhalers to control his asthma and was instructed to use the inhalers "as needed."  Aside from his occasional asthma, the prison health records demonstrate a clean bill of physical health.  (<u>See id.</u> at 240-65).

2. <u>Non-Treating Sources</u>

a. <u>Dr. Leena Phillip</u>

On November 30, 2009, after Santiago filed his application for disability benefits, Dr. Leena Phillip, M.D., performed a consultative internal medical exam at the Commissioner's request.  During that evaluation, Santiago reported that he had suffered from asthma since 1987, and last had experienced an asthma attack three days earlier, which he relieved by using an inhaler.  He reported that his asthma often was triggered by cold and humid weather.  Dr. Phillip noted that Santiago used his inhaler twice per day, but did not use a nebulizer at home, and had never been hospitalized for any asthma-related complications.  (<u>Id.</u> at 344).  Santiago further reported that he had experienced gastric ulcers for the last ten years, but did not currently have any abdominal pain.  (<u>Id.</u>). Dr. Phillip performed a comprehensive physical exam and recorded no abnormalities in Santiago's musculoskeletal or neurological system, with full strength and range of motion in his neck, back, shoulders, hips, arms and legs.  (<u>Id.</u> at 345-46).  Pulmonary function tests from that visit were normal.  (<u>Id.</u> at 347).  Dr. Phillip thus opined that Santiago was not physically limited in his ability to engage in daily living activities.  She declined to render an opinion on Santiago's mental functioning, deferring the issue to a psychologist. (<u>Id.</u> at 346).

b. <u>Dr. Leslie Helprin</u>

On November 30, 2009, psychologist Leslie Helprin, Ph.D., performed a consultative psychological medical examination of Santiago at the Commissioner's request. Santiago stated that he could dress, bathe and groom himself, cook and prepare food, and clean the home. (<u>Id.</u> at 341). He indicated, however, that he did not know how to do laundry, and that his girlfriend did his grocery shopping and helped him pay his bills. (<u>Id.</u> at 341-42). He further reported that he was able to drive and use public transportation on his own, and that he frequently socialized with his girlfriend and maintained adequate family relationships. Santiago told Dr. Helprin that he spent the majority of his days listening to music and watching television. (<u>Id.</u> at 342).

During his examination, Dr. Helprin observed that Santiago generally remained cooperative and presented himself adequately. (<u>Id.</u> at 340). He demonstrated fluent, clear speech and his thought processes appeared intact. He appeared fully oriented and his sensorium was clear. Dr. Helprin noted, however, that Santiago's concentration, attention, and memory skills were mildly impaired, that he had limited insight and borderline intellectual skills, and that his judgment was only "fair." (<u>Id.</u> at 341).

Based on these observations, Dr. Helprin diagnosed Santiago with bipolar disorder with psychotic features, polysubstance abuse in full sustained remission, and antisocial personality disorder with a need to rule out mental retardation. Dr. Helprin indicated that Santiago could follow and understand simple directions and instructions

14

and could perform simple rote tasks, but could not complete complex tasks because of his cognitive limitations.  Dr. Helprin further opined that Santiago could maintain attention and concentration for simple job tasks, and would be able to maintain a regular work schedule.  (Id. at 342).  Finally, due to Santiago's numerous run-ins with the law, Dr. Helprin opined that he could not make appropriate decisions, relate adequately to others, or deal appropriately with stress.  (Id.).

                c.     Dr. T. Inman-Dundon

On December 11, 2009, Dr. T. Inman-Dundon, a state agency psychological consultant, evaluated Santiago's medical record and completed a "Psychiatric Review Technique" form assessing his eligibility for disability benefits.  (Id. at 351).  Dr. Inman-Dundon found that Santiago suffered from bipolar disorder, antisocial personality disorder, and polysubstance dependance that was in remission, but concluded that none of these impairments satisfied the diagnostic criteria of a "listed impairment" for purposes of obtaining disability benefits.  (Id. at 351-54).  Dr. Inman-Dundon found that Santiago's symptoms did not meet the SSA listings for any organic mental disorder, anxiety-related disorder, somatoform disorder, psychotic disorder, mental retardation, autistic disorder, or other pervasive developmental disorder.  (See id. at 351-60).  She concluded that Santiago's mental impairment resulted only in a mild restriction on his daily living activities and moderate difficulties maintaining social functioning, concentration,

persistence and pace.  (Id. at 361).  Dr. Inman-Dundon further noted that Santiago did not

meet the criteria for a medically-documented chronic affective disorder.  (Id. at 362).

Dr. Inman-Dundon also evaluated Santiago's mental residual functional

capacity, focusing on Santiago's understanding and memory, sustained concentration and

persistence, social interaction, and adaptation.  Dr. Inman-Dundon concluded that

Santiago either had no significant limitations or moderate limitations in each of theses

areas.  (Id. at 367).  Ultimately, Dr. Inman-Dundon opined that Santiago had mild to

moderate psychiatric limitations, but nonetheless was capable of performing a wide range

of entry-level jobs in a low-contact setting.  (Id.).

C.    The ALJ's Decision

In her decision dated May 24, 2011, ALJ Edgell found that Santiago was

not disabled within the meaning of the Act and, therefore, denied his claim for disability

benefits.  (Id. at 20-31).  In reaching that conclusion, the ALJ applied the five-step

sequential analysis required by 20 C.F.R. §§ 416.1520 and 416.920.

At Step One, the ALJ determined that Santiago had not engaged in

substantial gainful activity since August 28, 2009, the date of his application for benefits.

(Id. at 23).

At Step Two, the ALJ found that Santiago suffered from bipolar disorder,

which is a "severe impairment" under the Regulations.  (Id. at 402).  She further

concluded that Santiago's asthma did not qualify as a severe impairment because the

16

pulmonary tests performed by Dr. Phillip documented clear lung fields and normal pulmonary functioning, and because Santiago's treating and non-treating physicians had classified his asthma as "mild" and "intermittent." (Id. at 24). In addition, the ALJ determined that Santiago's polysubstance abuse did not qualify as a severe impairment because it had been in a state of remission for several years. (Id.).

Turning to Step Three of the analysis, the ALJ determined that although Santiago's bipolar disorder qualified as a severe impairment under Step Two, it did not "meet[] or medically equal" any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). (Id.). Specifically, the ALJ found no objective evidence that Santiago's disorder satisfied any of the criteria in Paragraphs B or C of Section 12.04 of the Listings, which pertains to affective disorders. (Id.). Accordingly, the ALJ proceeded to Step Four of the analysis.

At Step Four, the ALJ assessed Santiago's residual functional capacity ("RFC"), and concluded that he had the RFC to perform unskilled work in a low-contact setting at all exertional levels. (Id.). ALJ Edgell first noted that Santiago's physical health imposed no exertional restrictions on his ability to work. Turning to Santiago's mental health, the ALJ found that Santiago's bipolar disorder had resulted in mild limitations on his ability to perform daily living activities, and moderate limitations in his ability to maintain social functioning, concentration, persistence, and pace. Given these limitations, the ALJ concluded that Santiago could perform the type of simple, rote tasks

17

that generally are associated with unskilled jobs.  She noted, however, that Santiago's

mood disorder would require him to work in a low-contact environment involving no

more than occasional contact with co-workers, supervisors, and members of the general

public.  (Id. at 24).

In reaching this conclusion, ALJ Edgell reviewed Santiago's medical and

nonmedical history, including his hearing testimony.  (Id. at 24-25).  Utilizing this

information, she followed a two-stage process, in which she first "determined whether

there is an underlying medically determinable physical or mental impairment . . . that

could reasonably be expected to produce [Santiago's] pain or other symptoms," and then

"evaluate[d] the intensity, persistence, and limiting effects of [Santiago's] symptoms to

determine the extent to which they limit [his] ability to do basic work activities."  (Id.).

ALJ Edgell concluded that Santiago's bipolar disorder could reasonably be

expected to produce the alleged symptoms, but that his statements concerning the

intensity, persistence, and limiting effects of his symptoms were not fully credible in light

of his physicians' observations and his own hearing testimony.  The ALJ noted that

Santiago's bipolar disorder appeared to be well-controlled when he adhered to his

treatment and avoided substance abuse.  Santiago himself reported no adverse side effects

from his medications, and testified that he never had required inpatient hospitalization for

his bipolar disorder.  Moreover, all of Santiago's treating and non-treating physicians and

psychologists had reported that Santiago was fully oriented and showed no indication of

perceptual abnormality. The evidence further suggested that Santiago retained a normal level of functioning when it came to daily living activities such as showering, grooming, dressing, cooking, cleaning, and traveling via public transportation. In sum, the ALJ found that the evidence was not consistent with Santiago's purported level of functional compromise. (Id. at 25).

In coming to her conclusion at Step Four, ALJ Edgell specifically noted that she concured with the opinion of Dr. Inman-Dundon, insofar as it was consistent with the objective medical evidence of record. She also credited the opinion of Dr. Helprin to some extent, although she noted that his conclusion concerning Santiago's inability to interact with others was undermined by Dr. Helprin's own evaluation records, which specified that Santiago generally was cooperative and could relate adequately to the examiner. (Id.).

ALJ Edgell also took into consideration Santiago's "marginal work history," which dated back to the period before the onset of Santiago's alleged disability. In the ALJ's opinion, Santiago's long periods of unemployment and his inability to hold a job for more than a few weeks suggested a weak "employment motivation" rather than an inability to engage in work-related activity. (Id.).

Finally, noting that Santiago had not engaged in any substantial gainful activity within the past fifteen years, the ALJ turned to Step Five to consider whether, despite his bipolar disorder, Santiago was capable of working in jobs that existed in

sufficient numbers in the national economy, given his age, education, and work experience.  The ALJ concluded that Santiago's bipolar disorder would have no effect on his ability to perform unskilled jobs, which "ordinarily involve dealing primarily with objects, rather than with data or people, and [] generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis."  (Id. at 26).

Based on all of these considerations, the ALJ concluded that Santiago was not disabled within the meaning of the Act.

D.    Appeals Council

On June 17, 2011, Santiago filed a request for review of ALJ Edgell's decision.  (Id. at 13-15).  Santiago first contended that review was appropriate because the ALJ's finding that he was able to engage in a number of daily living activities, such as bathing, grooming and cleaning, did not "equate to the ability to function at worklike activities on a sustained basis."  (Id. at 15).  Second, Santiago contended that the ALJ had failed to afford proper weight to Dr. Helprin's opinion, and had erred in finding Dr. Helprin's opinion inconsistent with the medical evidence as a whole.  Third, Santiago challenged the ALJ's finding that his own credibility was undermined by his "marginal work history," noting that he had been in prison for many years and thus could not have been employed during that time.  Fourth, Santiago claimed that ALJ Edgell had failed to assess properly the effects that his limited educational and work history had on his ability

to engage in gainful employment.  Finally, Santiago contended that the ALJ should have

secured the testimony of a vocational expert in determining whether Santiago could

perform any jobs that existed in the national economy.  (Id.).

      After considering Santiago's application, the Appeals Council found no

basis for granting review.  (Id. at 1-2).  Thus, on August 16, 2012, the ALJ's ruling

became the final decision of the Commissioner.  (Id.).

III.  Discussion

    A.  Standard of Review

      Under Rule 12(c), judgment on the pleadings is appropriate when the

material facts are undisputed and a party is entitled to judgment as a matter of law based

on the contents of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d

639, 642 (2d Cir. 1988); Carballo ex rel. Cortest v. Apfel, 34 F. Supp. 2d 208, 213-14

(S.D.N.Y. 1999).

      The Act, in turn, provides that "[t]he findings of the Commissioner of

Social Security as to any fact, if supported by substantial evidence, shall be conclusive."

42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v.

Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the

evidence be overwhelming, but it must be "more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A district court is not permitted to review the Commissioner's decision de novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d. Cir. 2004) (citing Schaal v. Apfel, 134 F. 3d 496, 501) (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence. See Hickson v. Astrue, No. 09 Civ. 2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011). When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position." Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001). This means that the ALJ's factual findings may be set aside only if a reasonable factfinder would have had to conclude otherwise. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012).

B.     Duty to Develop the Record

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, . . . [a court] must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Social Security Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks, ellipsis, and brackets omitted). Indeed, an ALJ's failure to

adequately develop the record is an independent ground for vacating the ALJ's decision and remanding the case.  Id. at 114-15.  When the record evidence is inadequate to determine whether an individual is disabled, the ALJ must contact the claimant's medical sources to gather additional information.  Schaal, 134 F.3d at 505; Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 344 (E.D.N.Y. 2010) (citing 20 C.F.R. § 404.1512(e), (e)(1)).  The ALJ "may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from [the] medical source."  20 C.F.R. § 404.1512(e)(1).

Here, ALJ Edgell discharged her duty to develop the record by inquiring into Santiago's medical and vocational history during the hearing and by requesting additional relevant records from Occupations that previously did not appear in the record. (See Tr. 52).

Santiago contends that the record was not fully developed because it included neither records from the Richard C. Ward inpatient rehabilitation program that Santiago attended in 2007, nor records of the outpatient care that Santiago received through "Restorative Management" immediately thereafter.  (ECF No. 11, ("Pl.'s Mem." 16).  Even if these records did exist, there is no reason to believe that they would have aided ALJ Edgell in determining whether Santiago was disabled in 2009, since he had been sober for nearly four years at the time of the hearing.  (See Tr. 42).  Santiago's mental health status during a period when he was withdrawing from drugs probably

would not have shed light on his ability to perform work-related activities in his current

sober state.  ALJ Edgell therefore had the discretion not to develop the record with

respect to Santiago's drug rehabilitation treatment years before the alleged onset of his

disability.  See Brown v. Comm'r of Soc. Sec., 709 F. Supp. 2d 248, 257 (S.D.N.Y. 2010)

("[T]he duty to develop the record extends only with respect to the 12-month period prior

to the 'filing date of the claimant's application for benefits.'" (citing 20 C.F.R. §

404.1512(d))); Infante v. Apfel, 2001 WL 536930, at *7 (S.D.N.Y. May 21, 2001)

("Whether additional medical evidence is necessary to adequately develop the record

beyond that statutorily mandated by the Act is under the discretion of the ALJ.").

     C.    <u>Disability Determination</u>

The term "disability" is defined in the Act as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1)(A).  In

determining whether a claimant is disabled, the Commissioner is required to apply the

five-step sequential process set forth in 20 C.F.R. §§ 404.1520, 416.920 (the

"Regulations").  The Second Circuit has described that familiar process as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not, the
> [Commissioner] next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities.  If the claimant suffers
> such an impairment, the third inquiry is whether, based solely on

> medical evidence, the claimant has an impairment which is
> listed in Appendix 1 of the regulations.  If the claimant has such
> an impairment, the [Commissioner] will consider him disabled
> without considering vocational factors such as age, education,
> and work experience. . . .  Assuming the claimant does not have
> a listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, he has the [RFC] to perform his
> past work.  Finally, if the claimant is unable to perform his past
> work, the [Commissioner] then determines whether there is
> other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)); accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

      The claimant bears the burden of proof with respect to the first four steps of

the process.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the

Commissioner finds that a claimant is disabled (or not disabled) at an early step in the

process, he is not required to proceed with any further analysis.  See 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999).

However, if the analysis reaches the fifth step of the process, the burden shifts to the

Commissioner to show that the claimant is capable of performing other work.  Poupore v.

Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

      In assessing whether a claimant has a disability, the factors to be considered

include: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such

facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s];

and (4) the claimant's educational background, age, and work experience." Rivera v.

Harris, 623 F.2d 212, 216 (2d Cir. 1980) (internal citations omitted).

D.   Treating Physician Rule

The "treating physician rule" requires an ALJ "to give controlling weight to the opinion of the claimant's treating physician[7] if the opinion is well supported by medical findings and is not inconsistent with other substantial evidence." Rosado v. Barnhart, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) (citing 20 C.F.R. § 416.927(d)(2)). As the Second Circuit has explained, a treating physician's opinion is typically accorded special consideration because of the "continuity of treatment he provides and the doctor/patient relationship he develops" with the claimant, which "place[s] him in a unique position to make a complete and accurate diagnosis of his patient." Monegur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983).

Nonetheless, the Commissioner need not grant "controlling weight" to a treating physician's opinion as to the ultimate issue of disability, as this decision lies exclusively with the Commissioner. See 20 C.F.R. § 404.1527(e)(1); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("[A] treating physician's statement that the claimant is disabled cannot itself be determinative."). Likewise, the Second Circuit has acknowledged that "[i]t is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence and the report of the consultative physician may constitute such evidence." Monegur, 722 F.2d at 1039. The

---

[7]   The Regulations define a "treating source" as any "physician, psychologist, or other acceptable medical source who provides . . . medical treatment or evaluation and who has . . . an ongoing relationship with [the claimant]." 20 C.F.R. § 416.902.

Commissioner must, however, always provide "good reasons" for the weight, if any, he gives to the treating source's opinion.  20 C.F.R. § 404.1527(d)(2).

IV.   Application of Law to Facts

    A.   Disability Analysis

       The question presented by the cross-motions is whether the ALJ's decision is legally correct and supported by substantial evidence.  Santiago seeks reversal of the ALJ's decision, as well as remand for the sole purpose of calculating benefits due, on the grounds that the ALJ:  (1) failed to consider the combined effects of all of Santiago's impairments; (2) failed to develop a complete medical record; (3) improperly substituted her own opinion for the opinion of medical sources; (4) failed to perform a function-by-function analysis of the combined effects of Santiago's impairments; (5) erred in finding that Santiago's impairment did not meet or medically equal one of the Listings; (6) misapplied the Regulations in evaluating Santiago's credibility; and (7) improperly drew her own conclusion about the availability of unskilled jobs, rather than calling a vocational expert to testify.  (Pl.'s Mem. 13-23).  The Commissioner disputes each of these assertions, maintaining that the ALJ applied the appropriate legal standards for determining disability under the Act and that her finding is supported by the evidence. (ECF No. 11 ("Comm'r's Mem.") at 1).

1.    First Step

The first step of the sequential analysis requires the ALJ to determine

whether the claimant has engaged in substantial gainful activity during the period at issue.

20 C.F.R. § 404.1520(a)(4)(i).  Based on the fact that Santiago earned only $11,207.55 in

the 2009 calendar year in which he applied for benefits, the ALJ determined that Santiago

had not engaged in substantial gainful activity since August 28, 2009, the date of his

application.  (Tr. 23).  That finding benefits Santiago and is consistent with all of the

evidence in this case.

2.    Second Step

The second step of the sequential analysis requires the ALJ to assess the

medical severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An

impairment is severe if it significantly limits the claimant's physical or mental ability to

perform basic work activities.  Id. § 404.1520(c).  At this step, the ALJ does not take into

consideration the claimant's age, education, or work experience.  Id.

The ALJ properly determined that Santiago's bipolar disorder constituted a

severe impairment within the meaning of the Regulations.  (Tr. 23-24).  In addition, the

ALJ correctly rejected Santiago's claim that his asthma and his polysubstance abuse

amounted to severe impairments.  (Id. at 24).

With respect to Santiago's asthma, the ALJ's determination was consistent

with Santiago's prison health records, which characterized the condition as mild and

28

intermittent, and with the respiratory and pulmonary testing performed by Dr. Phillip, which showed that Santiago had a clear lung field and normal pulmonary functioning. (Id. at 262, 345, 347-50).  It also was consistent with Santiago's own statements to Dr. Phillip that he never had been hospitalized or intubated for his asthma, and was able to control his flare-ups using an inhaler.  (Id. at 344).  The fact that Santiago was able to manage his asthma on his own is itself substantial evidence that weighs against a finding of a severe impairment.  See Ortiz v. Astrue, 875 F. Supp. 2d 251, 260 (S.D.N.Y. 2012) (no severe impairment where ailments were sufficiently controlled by medication and posed only a minimal limitation on claimant's ability to perform basic work activities); Thomas-Bryant v. Comm'r of Soc. Sec., No. 09 Civ. 7232 (PGG) (FM), 2011 WL 4150952, at *10 (S.D.N.Y. Aug. 26, 2011) (same).  Indeed, federal courts frequently have found that asthma controlled by an inhaler does not amount to a "severe impairment" within the meaning of the Act.  See, e.g., Izzo v. Comm'r of Soc. Sec., 186 F. App'x 280, 285 (3d Cir. 2006) (no severe impairment where asthma was controlled by an inhaler); Burrows v. Barnhart, No. 3:03CV342 (CFD) (TPS), 2007 WL 708627, at *6 (D. Conn. Feb. 20, 2007) (no severe impairment where weather-induced asthma was controlled by an inhaler and did not require use of a nebulizer); Lundy v. Massanari, No. 01 Civ. 0102 (JG), 2001 WL 826707 (E.D.N.Y. July 10, 2001) (no severe impairment where asthma was controlled by inhaler and claimant had not recently required hospitalization or emergency room treatment).

29

Since nothing in the record suggested that Santiago's asthma significantly limited his ability to perform basic work activities, the ALJ had no obligation to delve any deeper into the frequency and severity of the asthma attacks, or to seek further information from his treating sources.  Santiago's assignments of error in this regard thus lack merit.  (See Pl.'s Mem. 15-16).

Insofar as Santiago contends that the ALJ erred in failing to consider his possible mental retardation, (see id. at 14-15), that claim likewise is unpersuasive.  None of the physicians in this case ever diagnosed Santiago with mental retardation.  The only reference in the record to the possibility of mental retardation appears in the report of Dr. Helprin, who diagnosed Santiago with an antisocial personality disorder with the need to "rule out mental retardation."  (Tr. 42).  In medicine, the phrase "rule out" indicates a need to eliminate or exclude a diagnosis from consideration,[8] but it does not constitute a diagnosis itself.  See Merancy v. Astrue, 10 Civ. 1982 (MRK) (WIG), 2012 WL 3727262, at *7 (D. Conn. May 3, 2012) ("rule out" diagnosis is not a diagnosis itself).  Because Santiago never was diagnosed with mental retardation, the ALJ did not err in failing to find that it was a severe impairment at Step Two.  Id.

Moreover, even if Santiago had been diagnosed with mental retardation, there was substantial evidence in the record to suggest that the diagnosis did not amount to a severe impairment that would significantly limit his ability to perform the kind of

---

[8]    See Medicine.net, http://www.medterms.com/script/main/art.asp?articlekey= 33831 (last visited Feb. 24, 2014).

unskilled work that the ALJ ultimately found he could perform.  Indeed, Santiago has held a number of jobs over the years, (Tr. 41), and never has been fired due to a lack of intellectual capacity.  Also, although Santiago does not have a high school degree or a GED, he came within one point of passing the exam, which suggests that his intellectual capacity at least approaches that of a high school graduate.  (See id. at 226).  While it is true the medical records occasionally note some slight cognitive limitations, it appears that these were more likely related to Santiago's bipolar disorder than to severe mental retardation.  The ALJ thus reasonably excluded mental retardation when considering Santiago's severe impairments.

In sum, the record contained substantial evidence to support the ALJ's finding that Santiago's only severe impairment was his bipolar disorder.  Santiago nonetheless contends that the ALJ erred because she did not consider the combined effects of all of his impairments – including his asthma and his mild intellectual limitations – in reaching her disability determination.  (See Pl.'s Mem. 13-16).  That contention is without merit.  As is discussed below, the ALJ did consider whether the medical evidence, including evidence of Santiago's asthma, substantiated any claim of exertional limitation.  She found that it did not.  (Tr. 24).  She also considered whether the medical evidence suggested that Santiago suffered from any cognitive restrictions that would significantly limit his ability to perform unskilled work.  Again, she found that it did not.  (Id. at 25-26).  Thus, although the ALJ found that Santiago's only "severe"

impairment was his bipolar disorder, she properly considered all of Santiago's impairments, including his non-severe impairments, in reaching her ultimate disability determination.

    3.    <u>Third Step</u>

An ALJ who determines that a claimant suffers from at least one "severe" impairment must proceed to the third step of the sequential analysis. The third step requires the ALJ to determine whether the claimant has an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). <u>See</u> 20 C.F.R. § 404.1520(a)(4)(iii). The ALJ must base her decision solely on medical evidence, without regard to the claimant's age, education, or work experience. <u>Id.</u> § 404.1520(d). If the ALJ finds that the claimant has an impairment that meets or equals a condition listed in Appendix 1, the claimant is considered disabled within the meaning of the Act. <u>Id.</u> § 404.1520(a)(4)(iii), (d). If the claimant's impairment does not meet the criteria in Appendix 1, the ALJ must continue to the next step of the analysis.

Santiago's bipolar disorder must be evaluated under Section 12.04 of Appendix 1, which pertains to "affective disorders." Appendix 1 § 12.04. To satisfy this listing, the claimant must meet the requirements of both Paragraphs (A) and (B), or Paragraph (C). <u>Id.</u> The ALJ properly concluded that Santiago met the criteria for Paragraph (A), which requires the claimant to demonstrate a "medically documented persistence, either continuous or intermittent," of, among other disorders, "bipolar

syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes." Id. § 12.04(A). Ultimately, however, she concluded that Santiago had not satisfied the criteria in Paragraphs (B) or (C). The ALJ thus determined that Santiago's bipolar disorder did not "meet or medically equal" a condition listed under Section 12.04, and therefore did not, by itself, render him disabled within the meaning of the Act.

Paragraph B of Section 12.04 requires a claimant to show that his mental disorder has resulted in at least two of the following: (1) marked restriction in his activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. Id. § 12.04(B). After reviewing the record, the ALJ found that Santiago had "mild" restrictions in his daily living activities, "moderate" difficulty maintaining social functioning, and "moderate" difficulty maintaining concentration, persistence, or pace. In addition, she found that Santiago had not experienced any episodes of decompensation. She thus concluded that Santiago had not satisfied the requirements under Paragraph B.

The ALJ's conclusion with respect to Paragraph B finds substantial support in the record. First, several of Santiago's medical records indicate that he was capable of handling daily living activities. For example, Dr. Phillip, who performed an internal medical examination, reported that Santiago could cook, clean, do laundry, go shopping,

shower, bathe, and dress himself without substantial difficulty.  (Id. at 344).  Dr. Helprin,

the Commissioner's own consulting psychologist, indicated that Santiago was able to

engage in a number of daily living activities such as bathing, grooming and dressing

himself, cooking and cleaning, driving, and traveling via public transportation.  Indeed,

Dr. Inman-Dundon expressly stated in her report that Santiago was only mildly restricted

in his ability to perform daily living activities.

   In addition, Santiago himself indicated in his application that he generally

was able to take care of his personal hygiene and frequently handled the household

cleaning.  (Id. at 128-29).  He also stated that he was able to manage his own finances for

the most part, and readily admitted that his ability to handle his money had not

deteriorated since the onset of his bipolar disorder.  (Id. at 131).

   The ALJ's conclusion that Santiago had moderate difficulties sustaining

social functioning also is well-supported.  For example, Santiago testified at the hearing

that he spoke with his mother on the phone at least once a week and had maintained a

stable relationship with his girlfriend for the past four years.  (Id. at 48).  The records

from Occupations and Middletown indicate that Santiago remained cooperative

throughout his therapy sessions and adequately related to his therapists.  (See, e.g., id. at

228-30 ("appropriate" affect, generally positive mood, "mild" interpersonal/social

impairment), 235("clear" and "talkative"), 271 ("cooperative attitude" and "appropriate

affect"), 310-28 ("normal" affect); 378 ("cooperative"), 387 (same)).  Dr. Inman-Dundon

expressly noted that Santiago's social restrictions were "moderate," not "marked."  (Id. at

367).  Indeed, even Dr. Helprin, who opined in his report that Santiago could not

adequately relate to others or appropriately deal with stress, found Santiago to be

communicative, responsive, and cooperative throughout his evaluation.  (Id. at 341).

 Substantial evidence also supports the conclusion that Santiago had only

moderate restrictions in maintaining concentration, persistence, and pace, especially when

he complied with his treatment.  Throughout most of his therapy sessions at Occupations

and Middletown, Santiago exhibited clear thought processes and showed fair judgment

and insight.  (See, e.g., id. at 228, 235, 271-73, 310-28, 387, 410).  In fact, the only

instance in which any treating therapist noted a disruption in Santiago's thought processes

was during his first session at Middletown, which took place after a three-month period

during which he had not received any treatment.  (Id. at 380).

 The observations of the consulting psychologists further support the ALJ's

"moderate impairment" finding concerning Santiago's ability to maintain concentration,

persistence and pace.  Dr. Helprin reported that Santiago's attention, concentration and

memory were "mildly impaired," but that his thought processes otherwise were "coherent

and goal directed."  (Id. at 341).  According to Dr. Helprin, Santiago had the ability to

understand and follow simple instructions, complete simple tasks, and maintain a regular

schedule.  (Id.).  Dr. Inman-Dundon similarly found, based on a review of Santiago's

records, that Santiago was "moderately" but not "markedly" limited in his ability to maintain concentration, persistence and pace.  (Id. at 367).

Finally, the record contains no evidence that Santiago had suffered any episodes of decompensation.  The Regulations define "decompensation" as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  See Appendix 1 § 12.00(C)(4).  A claimant may satisfy these criteria by demonstrating "an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation," or by presenting medical records that show significant alteration in medication, hospitalization, inpatient treatment, or similar evidence showing the occurrence, severity, or duration of the episode.  Id.  Santiago presented no such evidence.  Santiago himself testified that he never had been hospitalized for his psychiatric issues.  (Tr. 49).  Nor does the record reflect any sudden increases in medication or other treatment.  Notably, when Santiago voluntarily discontinued his treatment at Occupations and then three months later presented at Middletown for services, Dr. Ozpak recommended that he "renew[]" his treatment, but did not prescribe any change or increase in medication, supervision, or therapy.  (Id. at 381).  Following that visit, Santiago continued to receive supportive counseling, but was not prescribed any further treatment.  (Id. at 383-92).

36

In sum, the record contains ample evidence to substantiate the ALJ's conclusion that Santiago did not suffer from two or more "marked" functional restrictions or repeated episodes of decompensation of extended duration as required by Paragraph B.

Appendix 1 also lists Paragraph C criteria for Santiago's bipolar disorder, which the ALJ must consider in the alternative if the claimant does not satisfy the Paragraph B criteria.  Although the ALJ in this case did not specifically address those criteria, it is clear from the record that Santiago's condition does not satisfy them.  The Paragraph C criteria for bipolar disorder include:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Appendix 1 § 12.04(C).  Santiago cannot satisfy these criteria.  As noted above, there is no evidence that Santiago had, or was at risk of experiencing, episodes of decompensation.  In addition, he had never required a "highly supportive living

arrangement."  Although Santiago's application indicates that his girlfriend assisted with certain household chores and sometimes helped him manage his finances, he reported that he otherwise was able to care for his personal needs on a regular basis.  His bipolar disorder therefore failed to meet the requirements under Paragraph C.

Because Santiago's condition did not satisfy the criteria under Paragraphs B or C of Section 12.04, the ALJ properly proceeded to the fourth step of the sequential analysis.

### 4.    Fourth Step

At the fourth step, the ALJ must determine the claimant's RFC, or the functions the claimant is able to perform despite his impairments, while considering the relevant medical or other evidence from the case record.  20 C.F.R. § 404.1524(a)(1), (3). The ALJ's RFC analysis must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work."  SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).  The analysis at this level involves a two-part inquiry. Murphy v. Barnhart, No. 00 Civ. 9621 (JSR) (FM), 2003 WL 470572, at *10 (S.D.N.Y. Jan. 21, 2003).  First, the ALJ must consider whether the claimant has a medically-determinable impairment that could reasonably be expected to produce the pain or symptoms alleged by the claimant.  Sarchese v. Barnhart, No. 01 Civ. 2172 (JG), 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002) (citing SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996)); 20 C.F.R. §§ 404.1529(b), 416.929(b).  Then, if the claimant makes

statements about his symptoms that are not substantiated by objective medical evidence, the ALJ must make a finding as to the claimant's credibility and determine the extent to which his symptoms truly limit his ability to perform basic work activities.  Sarchese, 2002 WL 1732802, at *7; SSR 96-7p, 1996 WL 374186, at *1.  A federal court must afford great deference to the ALJ's credibility finding so long as it is supported by substantial evidence.  Bischof v. Apfel, 65 F. Supp. 2d 140, 147 (E.D.N.Y. 1999); see also Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's determination [as to claimant's credibility] because [she] heard [claimant's] testimony and observed [her] demeanor.").

In assessing a claimant's credibility, the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony.  Lugo v. Apfel, 20 F. Supp. 2d 662, 663 (S.D.N.Y. 1998); SSR 96-7p, 1996 WL 374186, at *4.  The Regulations require the ALJ to consider not only the objective medical evidence, but also

> [(a) t]he individual's daily activities; [(b) t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; [(c) f]actors that precipitate and aggravate the symptoms; [(d) t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; [(e) t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; [(f) a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms . . . ; and [(g) a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)); see also Sarchese, 2002 WL 1732802, at *7 (listing factors).

Here, the ALJ concluded that Santiago's bipolar disorder could reasonably be expected to cause the psychological symptoms alleged in his application, but that his statements concerning the intensity, persistence, and limiting effects of his symptoms were "not fully credible." (Tr. 25). In support of this credibility assessment, the ALJ cited records from Santiago's various mental status evaluations, which continually indicated that Santiago was "fully oriented" and exhibited normal levels of perception. (Id.). In addition, she pointed to portions of Santiago's testimony in which he conceded that he had not experienced any side effects from his medication and had never required hospitalization for his psychiatric issues. (Id.). She further noted that Santiago was able to take care of his personal hygiene and other household chores, and had maintained functional relationships with his girlfriend and family members. (Id.). These observations all are substantially supported by the record. The ALJ thus reasonably discounted Santiago's subjective complaints regarding the limiting effects of his bipolar disorder.

After considering all of the objective medical evidence and appropriately rejecting certain of Santiago's subjective complaints, the ALJ concluded that Santiago had the RFC to perform unskilled work in a low-contact setting at all exertional levels. (Id. at 24). In reaching this conclusion, the ALJ generally credited the opinion of Dr.

Inman-Dundon, who found that Santiago had the ability to "perform a range of entry level work in a low-contact setting." (See id. at 367 ("[T]he undersigned generally concurs with the assessment as made at the previous level of administrative review.")).  She also partially credited the opinion of Dr. Helprin, who found that Santiago would be able to understand and follow simple instructions, maintain a regular schedule, and sustain sufficient concentration and attention to perform simple, rote tasks. (See id. at 341).  The ALJ declined, however, to credit Dr. Helprin's opinion that Santiago would be unable to make appropriate decisions, relate adequately to others, or deal appropriately with stress. In the ALJ's view, those opinions were belied by Dr. Helprin's own evaluation records, which indicated that Santiago cooperated fully with the examination and did not have difficulty relating to the examiner. (See id. at 340).

Santiago appears to contend that the ALJ should have afforded controlling weight to all of Dr. Helprin's opinions, since, in Santiago's view, they all were "well-supported." (Pl.'s Mem. 18).  That contention fails for several reasons.  First, the "well-supported" language that Santiago relies upon appears in a part of the Regulations that applies to the opinions of treating sources.  See 20 C.F.R. § 404.1527 ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will

give it controlling weight.").  Dr. Helprin, who only performed a consultative examination on one occasion and never rendered any treatment, was not a treating source.

Second, in light of the fact that Dr. Helprin and Dr. Inman-Dundon reached different conclusions regarding Santiago's vocational limitations, the ALJ was entitled, and in fact was logically required, to credit one of those opinions over the other.  See Richardson, 402 U.S. at 399 (ALJ, as the trier of fact, has duty to resolve conflicts presented by competing medical evidence).  Since portions of Dr. Helprin's opinion arguably were contradicted by his own observations, the ALJ reasonably decided to afford greater weight to Dr. Inman-Dundon's opinion, since that opinion was internally consistent and well-supported by the objective medical evidence, including the records from Santiago's treating psychologists.  Contrary to what Santiago argues, the ALJ was not required to give "more weight" to Dr. Helprin simply because he examined Santiago while Dr. Inman-Dundon did not.  (See Pl.'s Mem. 17).  Although the Regulations indicate that more weight generally will be afforded to the opinion of an examining source, the ALJ is not required to credit an examining source's opinion over a non-examining source's opinion if the objective medical evidence suggests that she should do otherwise.  See 20 C.F.R. § 404.1527(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive.").

Third, it appears that Dr. Helprin's concerns regarding Santiago's ability to relate adequately to others and deal appropriately with stress could largely be alleviated by Dr. Inman-Dundon's suggestion that Santiago be placed in a low-contact setting requiring minimal interaction with people. Since the appropriate work environment would eliminate Dr. Helprin's concerns, the ALJ acted reasonably in discounting those apprehensions.

Finally, even if a de novo review of the record would suggest that Dr. Helprin's opinion was more credible than that of Dr. Inman-Dundon, this Court is not in the position to second guess the ALJ's conclusions so long as they are supported by substantial evidence. Marquez v. Colvin, No. 12 Civ. 6819 (PKC), 2013 WL 5568718, at *14 (S.D.N.Y. Oct. 9, 2013). Thus, even if there was substantial evidence supporting Dr. Helprin's opinion, the Court would not be at liberty to reverse the ALJ's decision.

The ALJ's conclusion at Step Four was consistent not only with the consulting experts' opinions, but also with the observations of Santiago's treating therapists at Occupations and Middletown. The vast majority of those records indicate that Santiago was fully oriented and demonstrated clear thought processes and fair judgment. As discussed earlier, any fluctuation in Santiago's functional impairments seems to have been strongly correlated with whether he was receiving treatment. Indeed, as the ALJ noted in her decision, Santiago's bipolar disorder was generally well-

controlled "when he adhere[d] to treatment and avoid[ed] engaging in substance abuse." (Tr. 25).[9]

Santiago takes issue with the ALJ's conclusion in part because, in his view, conflicts with the opinions of Morales and Strock, two of his initial treating therapists at Occupations. (Pl.'s Mem. 19). The last time Santiago saw either of these therapists was January 9, 2007, over two and one-half years before he filed his application for benefits. Their opinions thus shed little light on Santiago's level of disability during the relevant period, which followed after several years of treatment from other therapists and physicians. Moreover, despite the fact that these therapists occasionally recorded GAF scores in the "severe" range, they both also noted that Santiago maintained coherent thought processes and memory, and generally remained cooperative throughout his therapy sessions.[10] Although neither therapist rendered any opinion as to whether Santiago's work capacity was limited by his bipolar disorder, their observations are not

---

[9]        In his Reply brief, Santiago appears to argue that this statement amounted to a determination that Santiago's application should be dismissed because he had "failed" to follow a prescribed treatment plan that otherwise would restore his ability to work. (Pl.'s Reply 5-6). However, it is clear from the context of the ALJ's decision that she did not intend to suggest that Santiago had failed to follow his treatment plan. Rather, she found that Santiago generally had followed his treatment plan and, consequently, was able to control the symptoms of his bipolar disorder.

[10]        The Commissioner has made clear that the GAF scale does not have a direct correlation to the severity requirements contained in the Listings that the ALJ considers at Step Three. Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01 (Aug. 21, 2000). The ALJ nevertheless may consider a claimant's GAF score in determining his RFC at Step Four. Even when the ALJ does so, however, she need not afford controlling weight to the GAF score, especially if it conflicts with the test administrator's other observations.

inconsistent the ALJ's conclusion that Santiago could succeed in a low-contact work environment.

Moreover, even if the ALJ's conclusion did conflict with the opinions of Morales and Strock, the ALJ would not have been required to afford their opinions controlling weight. As therapists and not physicians, Morales and Strock are not considered "medical sources" under the Regulations. See Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995). The ALJ thus may use their opinions to help her understand the effects of the claimant's impairments on his capacity to work, but need not afford them the controlling weight that ordinarily attaches to a treating physician's opinion. Id. (citing 20 C.F.R. §§ 404.1527(a)(2), 404.1513(a), 404.1513(e)).

Santiago also contends that ALJ Edgell's conclusion is inconsistent with Dr. Ozpak's opinion, which, in his view, should have been afforded controlling weight. (Pl.'s Mem. 16-17). Like Morales and Strock, Dr. Ozpak never rendered any specific opinion regarding Santiago's work capacity. In any event, to the extent that Dr. Ozpak's observations bear any relation to Santiago's work capacity, they are not inconsistent with the ALJ's conclusion. Even during his initial meeting with Santiago, Dr. Ozpak noted that Santiago was cooperative and showed fair judgment and insight. (Tr. 378-79). And although Santiago's thought processes were disorganized during that initial visit, Dr. Ozpak's records suggest that they improved once Santiago began receiving treatment. (See id. at 387). Moreover, the fact that Santiago had a GAF score of 55 during his first

visit with Dr. Ozpak, (id. at 380), does not, in and of itself, indicate that Dr. Ozpak would

have concluded that Santiago could not perform unskilled work in a low-contact

environment.  Once again, Santiago's GAF score is not dispositive of disability, but

merely one piece of evidence that the ALJ may consider in drawing her conclusion.

Santiago finally argues that the ALJ erred at Step Four because she did not

specify the functions that Santiago could perform when explaining her RFC

determination.  (Pl.'s Mem. 19-20).  As support for this claim, Santiago cites Social

Security Ruling 96-8p, which states that the ALJ's "RFC assessment must . . . assess [the

claimant's] work-related abilities on a function-by-function basis, including the functions

in paragraphs (b), (c), and (d) of 20 C.F.R. [§§] 404.1545 and 416.945."  1996 WL

374184, at *2 (July 2, 1996).  The Regulations referenced in that ruling require the ALJ to

assess the claimant's "physical abilities," "mental abilities" and "other abilities" affected

by his impairment.  20 C.F.R. §§ 404.1545(b)-(d), 416.945(b)-(d).  The ALJ in this case

properly adhered to that procedure.  She first concluded that Santiago's bipolar disorder

did not limit his physical abilities in any way.  She then concluded that his mental

abilities were mildly or moderately restricted by his bipolar disorder, but that he

nonetheless maintained the ability to perform unskilled work in a low-contact setting.

(Tr. 25).  Santiago's allegations to the contrary are plainly without merit.

46

In sum, ALJ Edgell applied the correct legal procedures at Step Four and reached a conclusion that was supported by substantial evidence.  She thus correctly proceeded to the fifth step in the sequential analysis.

    5.    Fifth Step

At the fifth step, the ALJ must assess the claimant's RFC and determine whether, based on the claimant's age, education, and work experience, the claimant could "make an adjustment to other work."  20 C.F.R. § 404.1520(a)(4)(v).  As part of this analysis, the ALJ must determine whether there are jobs in the national economy that the claimant could perform.  SSR 83-10, 1983 WL 31251, at *4 (1983).   In an "ordinary case," when the claimant has only an exertional impairment,[11] the ALJ may meet this burden by applying the Medical-Vocational Guidelines, also known as the Grids.  Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986); see also SSR 83-11, 1983 WL 31252, at *1 (1983) (use of Grids to direct conclusion of "disabled" or "not disabled" allowed only when criteria of a rule in the Grids are "exactly met").  When a claimant experiences nonexertional limitations,[12] the ALJ, in certain situations, cannot satisfy this burden through use of the Grids alone.  Bapp, 802 F.2d at 605-07.  The Second Circuit has

---

[11]    "Exertional limitations" are "limitations and restrictions imposed by [a claimant's] impairment(s) and related symptoms" that affect his "ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. § 404.1569a(b).

[12]    "Nonexertional limitations" include, inter alia, most mental impairments, such as depression, anxiety, and inability to concentrate.  20 C.F.R. § 404.1569a(c)(1); SSR 85-15, 1985 WL 56857, at *2 (1985).

explained that the ALJ may not solely rely on the Grids if a nonexertional limitation "has any more than a 'negligible' impact on a claimant's ability to perform the full range of work." Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) (quoting Zabala v. Astrue, 595 F.3d 402, 411 (2d Cir. 2010)).  A nonexertional impairment is non-negligible "when it . . . so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Zabala, 595 F.3d at 411 (internal quotations marks omitted).

Whether expert testimony is required must be determined on a "case-by-case basis." Bapp, 802 F.2d at 605-06.  "[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the [Grids]." Id. at 603.  In short, the ALJ may apply the Grids – without calling a vocational expert – if they "adequately reflect a claimant's condition." Id. at 605.

In this case, the ALJ concluded at Step Four that Santiago's bipolar disorder did not significantly diminish his work capacity.  As discussed previously, that conclusion finds substantial support in the record.  Since Santiago's condition did not significantly limit his work capacity, the ALJ was not required to take testimony from a vocational expert. See Zabala, 595 F.3d at 411 ("The ALJ found that Petitioner's mental condition did not limit her ability to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision.  Thus, her nonexertional limitations did not result in an additional loss of work capacity, and the

48

ALJ's use of the Medical-Vocational Guidelines was permissible."). The ALJ instead properly relied on the Grids in determining that Santiago was not disabled within the meaning of the Act.

Since Santiago had only nonexertional limitations, and thus could perform work at all levels of exertion, the ALJ looked to Section 204.00 of the Grids to determine Santiago's potential occupational base. Pursuant to that section of the Grids, where a claimant suffers no exertional limitations, the ALJ must simply consider whether the claimant can meet the mental demands of "unskilled" jobs. 20 C.F.R. Part 4, Subpt. P, App. 2 ("Appendix 2") § 204.00; see also SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985) ("Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work . . . , the final consideration is whether the person can be expected to perform unskilled work."). The mental demands of unskilled work include the ability, on a sustained basis, "to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857, at *4. If the ALJ determines that the claimant is capable of meeting these demands, then the Grids direct a finding of "not disabled." Appendix 2 § 204.00.

As discussed above, the ALJ appropriately concluded at Step Four that Santiago possessed the capacity to perform unskilled work. That conclusion was

consistent with the objective medical evidence of record, including the opinions of Drs. Inman-Dundon and Helprin and Santiago's treating therapists at Occupations and Middletown.  ALJ Edgell thus properly determined that Santiago was not disabled.

V.    Conclusion

For the foregoing reasons, the Court should deny Santiago's motion for judgment on the pleadings, (ECF No. 10), and grant the Commissioner's cross-motion for judgment on the pleadings, (ECF No. 16).

VI.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for extension of time for filing objections must be directed to Judge Daniels.  The failure to file these timely objections will result in a waiver of those

objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b); Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

Dated:          New York, New York
                February 25, 2014

                                              FRANK MAAS
                                    United States Magistrate Judge

Copies to:

Honorable George B. Daniels (via hand delivery)
United States District Judge

All counsel (via ECF)